UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DONALD WAYNE FLINT,

    Defendant.
    _____/

Case No. 07-20333

Honorable Patrick J. Duggan

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 11, 2011.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

On June 16, 2011, Donald Wayne Flint ("Defendant"), a federal prisoner currently confined at the Federal Correctional Institution in Fort Dix, New Jersey, filed a *pro se* motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. Defendant challenges his convictions for sexual trafficking of children and aiding and abetting, 18 U.S.C. §§ 1591, 2, and interstate transportation of minors for prostitution and aiding and abetting, 18 U.S.C. §§ 2423(a), 2. In his motion, Defendant asserts that he was denied the effective assistance of counsel, citing several alleged errors committed by his attorney. The government responded to Defendant's motion, and Defendant filed a reply. For the

reasons stated below, the Court denies Defendant's motion.

## I. Factual and Procedural Background

The Court recites the facts of this case as summarized by the Court of Appeals:

On June 18, 2007, the defendant Donald Flint (a.k.a. "Black") and his cousin James Roney (a.k.a. "Man") took a trip from their current hometown of Cleveland, Ohio, to their former hometown of Detroit, Michigan, so that Flint could deliver a dog (a pit bull named "Baby Girl") to his then six-year-old son, who was on visitation with his birth mother in Detroit for the summer. Flint and Roney took two women on the trip with them: Chaunita Crawley (a.k.a. "Shay") and "Jane" (a.k.a. "Boss"). Jane was only 15 years old, but routinely lied about her age, claiming to be older. She had been living on the street, exchanging sex for drugs and shelter, for some period of time, and Flint, Roney, and Crawley thought she looked and acted older. Even one of the arresting officers testified that she did not immediately suspect that Jane was a minor.

The four left Cleveland at about 12:30 in the afternoon, bound for Detroit in Roney's Suburban. None of them brought a change of clothes or any overnight items. Only Flint brought money, about $400: some to pay Roney for the trip (Roney never had any money), some to give to his son, and some in case of an emergency. Only Crawley brought any identification.

When they arrived in Detroit, Flint's son was not at home, so they went to see one of Roney's relatives. They then went to the All-Star Club, a nude-dancing establishment operated by another of Roney's relatives, to try to get the girls some work there, but neither of the girls had proper paperwork. Thus thwarted, Flint and Roney discussed the possibility of having the girls engage in a little prostitution, but instead, they bought some marijuana, smoked it, and drove around the city, sightseeing. They slept in the Suburban that night and rented a hotel room the next day - Crawley rented the room and Flint paid for it. During the day, Flint took the women to a store to buy hair extensions and clothing. Flint also bought some more marijuana and some ecstasy, which the two women quickly ingested. Also, at some time or times during the day and evening, Roney had sex with both of the women and Flint had sex with Jane in the hotel room. At one point, Roney and Flint both had sex with Jane at the same time.

That night, Roney and Flint took the two women to a location known as "the track," an area where prostitutes go to meet customers, so that the women could make some money as prostitutes. At some point, the two women met a

customer and took him to a hotel (not the room in which the four had been staying) and had sex with him in exchange for $60. They gave the money to Roney and Flint and returned to the track, though they did not stay together. Jane apparently wandered off and found yet another customer with whom she had sex. Meanwhile, Crawley and Roney went to his sister's house and Flint visited his mother's grave. But, during the evening, undercover police surveying the area had taken note of the two women because they were dressed alike and were unknown to the police officers, who were familiar with the regular prostitutes.

At about 7:00 a.m. on the following morning, the police followed Crawley and Roney to the hotel where they met up with Flint. The police approached and while they were questioning these three, Jane arrived (having been gone for several hours). Initially, the three claimed not to know her, but eventually they admitted that they knew her (and she them), though none of them knew her real name (nor did she know their real names). One of the prostitution-task-force officers suspected that Jane was a minor and asked her age. She said she was 20, but after persistent questioning from the officer, she finally admitted that she was 15. It was later determined that she was, in fact, 15.

Flint waived his *Miranda* rights and spoke with the police in a recorded interview. During the interview, Flint admitted that he had had sex with Jane several times, but insisted that he did not know she was underage. When one of the officers suggested that Flint might have raped Jane, Flint was emphatic that the sex was consensual and never forced. He explained that Jane was a "bopper" - someone who liked to smoke marijuana and have sex all the time - and at one point, even insisted that he would find a prostitute and pay for sex rather than committing rape; Flint never suggested that Jane was herself a prostitute.

Federal prosecutors charged Flint with: (1) Conspiracy, 18 U.S.C. § 371; (2) Sex Trafficking of Children, § 1591; (3) Interstate Transportation of Minors for Prostitution, § 2423(a); and (4) Interstate Transportation for Prostitution, § 2421. The case proceeded to jury trial, where Crawley and Jane, along with three of the arresting officers, testified for the prosecution. Flint testified in his own defense, which was two-fold. First, he insisted that did not know that Jane was a minor - according to Flint, Crawley, and even one of the testifying officers, Jane looked like an adult (particularly in her street-hardened condition and the clothes and wig she had been wearing); Jane carried herself as an adult and frequented adult-only establishments in Cleveland, where Flint had seen her numerous times in the company of other, older men; and Jane told everyone she was 18, or sometimes that she was 20. On the other hand, Jane testified that before leaving Cleveland, she had told Roney and Flint that she was 16.

> Even though she was actually 15, this was still an assertion that she was a minor.
>
> Flint's second defense was that before leaving Ohio, neither he nor any of his compatriots had intended to become involved in prostitution, and the idea of prostitution had come up only after they were in Detroit. Flint testified that the purpose of the trip had been to bring a dog to his son and that they had not intended to stay any longer than was necessary to deliver the dog, which was why none of them had brought any clothes or overnight items. In fact, Crawley testified that the prostitution was her idea and that she had not formed the idea until they had been rebuffed at the strip club. Jane testified that no one had mentioned prostitution to her until after they were in Michigan, but claimed that - looking back on the trip - Roney and Flint had given "little clues" about prostitution on the drive up, though she could not remember even a single one of those comments or clues. The government argued that the jury could infer that Flint and Roney had the requisite intent while still in Ohio because they had brought these two women on the trip, because they had so quickly upon arrival taken these two women to "the track," and because, at least according to Jane's testimony, Flint had "coached" Jane in how to be a prostitute, e.g., where to stand, what to say, and how much to charge.
>
> The jury acquitted Flint on counts one and four, but convicted him on counts two and three: sex trafficking of children and interstate transportation of minors for prostitution, respectively.

*United States v. Flint*, 394 F. App'x 273, 275-77 (6th Cir. 2010) (footnote omitted).

Defendant's convictions were affirmed on appeal. *Id.* at 280. On June 16, 2011,

Defendant filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §

2255, arguing that he was denied the effective assistance of counsel.

## II. Governing Law

To show that he was denied the effective assistance of counsel, Defendant must satisfy a two-prong test. First, he must show that, considering all of the circumstances, his attorney's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668,

4

687, 104 S. Ct. 2052, 2064 (1984). Defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. at 689, 104 S. Ct. at 2065. In other words, Defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S. Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955)). Second, Defendant must show that the deficient performance prejudiced his defense. *Id*. at 687, 104 S. Ct. at 2064. To demonstrate prejudice, Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. Defendant bears the burden of demonstrating a reasonable probability that the result of the proceeding would have been different but for counsel's allegedly deficient performance. *Wong v. Belmontes*, --- U.S. ----, 130 S. Ct. 383, 390-91 (2009).

### III. Discussion

Defendant argues that he was deprived of the effective assistance of counsel because of his attorney's failure to: (1) file a motion to suppress evidence; (2) conduct a sufficient pretrial investigation; (3) interview prospective witnesses; (4) present the videotaped testimony of "Jane"; and (5) adequately prepare Defendant for cross-examination by the prosecutor. The Court shall address each of these claims in turn.

### A. Counsel's Failure to File a Motion to Suppress Evidence

Defendant asserts that his counsel performed deficiently by failing to file a motion to suppress his post-arrest statement. "The Fifth Amendment prohibits the prosecution's use of a defendant's compelled testimony." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th

5

Cir. 1994) (citing *Oregon v. Elstad*, 470 U.S. 298, 306-07, 105 S. Ct. 1285, 1292 (1985)). "An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Id.* (citing *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612, 1617 (1976)). To demonstrate that his confession was involuntary, a defendant must demonstrate that: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).

Defendant asserts that he was deprived of food, water, and sleep when he made his statement, but the Court finds no indication of such coercion. Defendant claims that he was arrested at 7:45 a.m. and interviewed between 3:00 p.m. and 6:00 p.m. that same day. The videotape of the interview shows that the police provided Defendant with a bottle of water before the interview began, and at no time during the interview did Defendant indicate his reluctance to proceed with questioning. Although Defendant may not have eaten or slept in the hours just prior to his interview, there is no indication that this was the result of police coercion.

Defendant claims that his statement was coerced because he was under the influence of marijuana and Benadryl at the time. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). Defendant has failed to identify any

coercive actions taken by the police. During the interview, he admitted to using marijuana and Benadryl voluntarily, and there is no evidence indicating that the police attempted to exploit his supposedly weakened mental state. In fact, when the police asked Defendant if he was "high right now or anything," he replied, "Sir, I'm sober." Pl.'s Mot. Ex. 1 at 27. Because Defendant has failed to demonstrate coercion, the Court cannot conclude that his statement was involuntary due to the influence of drugs. *See United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001).

Defendant argues that his statement was the product of coercion because he believed that he was being charged with rape. Subjective beliefs alone are insufficient to render a defendant's confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 523 (1986). "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.* at 170, 107 S. Ct. at 523. Defendant was informed of his *Miranda* rights before making his statement, and there is no indication that police action led to his alleged belief that a rape charge would require him to speak with the police. The Court therefore cannot conclude that Defendant's statement resulted from coercion.

Defendant also contends that his statement was coerced because the interview was excessively long. In evaluating such claims, the Court considers the totality of the circumstances, including the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Ledbetter*, 35 F.3d at 1067. At the time of his

7

arrest, Defendant was thirty-four years old, had an eighth-grade education, and could read, write, and understand English. He was read his *Miranda* rights and indicated to the police that he understood them. The police did not use physical punishment or intimidation, and the interview was conducted in a relaxed and non-confrontational manner. The interview lasted approximately two hours and forty-five minutes, but this appears to have been a result of the officers' efforts to clarify the chronology of events described by Defendant and understand the involvement of each person in those events. Even so, the Supreme Court has held that an interview of similar length did not render a defendant's statement involuntary, absent other facts indicating coercion, such as threats or deprivation of sleep and food. *Berghuis v. Thompkins*, --- U.S. ----, 130 S. Ct. 2250, 2263 (2010) ("It is true that apparently [the defendant] was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive."). Under these facts, the Court cannot conclude that Defendant's interview was so excessive in length that it could be considered coercive.

As the police did not use objectively coercive tactics, Defendant cannot establish that his statement was involuntary. *See Johnson*, 351 F.3d at 260. Thus, a motion to suppress the statement would have been futile. Counsel's failure to file a frivolous motion cannot be considered deficient performance, and the Court accordingly rejects Defendant's claim.

**B. Counsel's Failure to Conduct Adequate Pretrial Investigation**

Defendant asserts that his attorney failed to sufficiently investigate the circumstances surrounding his interrogation, and therefore failed to obtain evidence indicating that his statement was coerced. The Court has already concluded that Defendant's statement was

voluntary. Thus, Defendant cannot show that he was prejudiced by his attorney's alleged failure to investigate. Absent a showing of prejudice, Defendant's ineffective assistance of counsel claim fails. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

**C. Counsel's Failure to Interview Prospective Witnesses**

Defendant argues that counsel failed to interview friends and family members who could have testified regarding his intelligence. It is unclear precisely what this testimony would have established or how it would have benefitted Defendant. The Court notes that Defendant testified at trial and the interview videotape was played for the jury. This gave the jury considerable opportunity to assess his intelligence. Defendant has not established that he was prejudiced by his attorney's failure to interview friends and family members.

Defendant also contends that his attorney was ineffective for failing to interview witnesses who would have testified that he traveled to Detroit from Cleveland to deliver a dog to his son. However, the statute under which Defendant was charged does not require that prostitution or criminal sexual activity was the only purpose of his interstate travel. *See United States v. Salter*, 346 F.2d 509, 511 (6th Cir. 1965) ("It was not necessary to prove that the interstate transportation was for the sole purpose of prostitution."). The testimony of these witnesses therefore would not have precluded a finding of Defendant's guilt. A conviction was warranted if at least one purpose of the interstate travel was that a minor engage in prostitution, even if Defendant had also intended to deliver the dog to his son. As the Court of Appeals noted, the prosecution offered ample evidence from which the jury could conclude that Defendant transported a minor to Michigan with the intent that she engage in prostitution or criminal sexual activity. Defendant purchased condoms,

9

took "Jane" to "the track" within hours after they arrived in Detroit, and told her how much to charge customers. *Flint*, 394 F. App'x at 279. "Jane" also testified that Defendant made certain comments during the drive from Cleveland about her engaging in prostitution. *Id.* Defendant testified at trial about his intent to deliver the dog, and he has failed to establish a reasonable probability that he would have been acquitted if additional witness testimony had buttressed this claim.

### D. Counsel's Failure to Present Videotaped Testimony

Defendant asserts that his attorney erred in failing to introduce videotaped testimony of "Jane" that contained some statements contradicting her trial testimony. Defendant's attorney attempted to introduce the video during his case-in-chief, but it was ruled inadmissible because the witness had not been confronted with it during her trial testimony. Upon further questioning by the Court, counsel stated that he had not introduced the video because he believed that the sympathy it might generate in favor of the victim outweighed any value to Defendant. Counsel's decision is presumed to be sound trial strategy, *see Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, and the Court concludes that this is the sort of strategic choice that should not be second-guessed with the benefit of hindsight.

### E. Counsel's Failure to Adequately Prepare Defendant for Cross-Examination

Defendant argues that his attorney failed to adequately prepare him to testify at trial. Defendant claims that his attorney should have advised him to answer only "yes" or "no" when asked particular questions by the prosecutor, but has not explained how this would have resulted in a different outcome. Defendant bears the burden of demonstrating that he

10

was prejudiced by his counsel's error.  *See Wong*, 130 S. Ct. at 390-91.  He has set forth only conclusory assertions, and these are plainly insufficient to justify relief.

### IV. Conclusion

For the reasons set forth above, the Court concludes that Defendant is not entitled to relief based on the grounds asserted in his motion.

When a district court enters a final order adverse to a § 2255 movant, it must issue or deny a certificate of appealability.  Rule 11(a) of the Rules Governing Section 2255 Proceedings.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To demonstrate entitlement to a certificate of appealability, a movant must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603-04 (2000) (internal quotation marks and citation omitted).  Stated differently, the movant must show "that reasonable jurists would find the . . . court's assessment of the constitutional claims debatable or wrong."  *Id.*  Reasonable jurists would not find this Court's assessment of the merits of Defendant's claims debatable or wrong.

Accordingly,

**IT IS ORDERED** that Defendant's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 is **DENIED**;

**IT IS FURTHER ORDERED** that the Court **DECLINES** to issue Defendant a certificate of appealability.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:

Saima S. Mohsin, A.U.S.A.

Donald Wayne Flint, #42008-039
FCI Fort Dix
Federal Correctional Institution
P.O. Box 2000
Fort Dix, NJ 08640